# Supreme Court of the Navajo Nation

**In re Claim of Ray Joe Jr.,**
**EBRB-003-92**
**Decided September 8, 1993**

## OPINION

Before YAZZIE, Chief Justice, AUSTIN and TOLEDO* (by special designation) Associate Justices.

Earl Mettler, Esq., Albuquerque, New Mexico, for the Appellant; and Helen Avalos, Esq., Navajo Nation Department of Justice, Window Rock, Navajo Nation (Arizona), for the Appellee.

Opinion delivered by YAZZIE, Chief Justice.

This is an appeal from an August 11, 1992 decision of the Navajo Nation Workmen's Compensation/Employees' Benefits Review Board. The Court has jurisdiction over the appeal pursuant to the Navajo Nation Workmen's Compensation Act, 15, N.T.C. § 1011(b).

## I

Ray Joe Jr. is a mechanic who suffered two work place injuries while he was employed by the Navajo Agricultural Products Industry. The first injury, to the back, occurred on May 9, 1986. Joe received $8,000 compensation for it. The second injury, also to the back, occurred on March 24, 1987, when Joe suffered a back "twist" while removing an engine from a road grader with a hoist. The second injury is the subject of this appeal.

Joe applied for benefits under the Act, and received medical and indemnity payments while he was unemployed as the result of his injury. On May 10, 1990, Joe went to Dr. Thomas C. Fleming, M.D., for an independent medical examination. Dr. Fleming determined that the second injury was an aggravation of the first, and assessed a "5% permanent impairment rating." On the basis of that rating, the Navajo Nation Workmen's Compensation Program valued Joe's injury and offered a final settlement of $1,748.63. The Program arrived at that figure by multiplying an hourly wage ($6.00) times average work hours per week (46.63) times 125 weeks times five percent. That formula is based upon the statutory provision for nonscheduled permanent impairments, which requires a calculation of the percentage of total disability. 15 N.T.C. § 1049 (c).

66

Joe was dissatisfied with the Program's determination and rejected the offer of payment. He then filed a claim with the Board arguing that the Act requires compensation in accordance with the claimant's level of disability, not his level of physical impairment. The five percent rating measured Joe's physical limitations alone; it did not compute the vocational effects of the injury. In his appeal brief, Joe explains that a "disability" "includes consideration of vocational factors and actual ability to engage in work activity." A "physical impairment" "is simply a medical measurement of the physical effects of an injury, without considering any resulting consequence." Appellant's Brief at 3.

The Board considered Joe's argument and concluded that it could not consider vocational factors and the actual ability to engage in work activity when making an award under 15 N.T.C. § 1049. The Act does not define "disability" or "impairment," and the Board could not glean the intent of the Navajo Nation Council when it enacted the benefits provision of the Act at 15 N.T.C. § 1049. There are numerous definitions of the term "disability" in other social security laws (i.e. laws which provide benefits for various incapacities from gainful employment). The Board chose to read the terms "disability" and "impairment" as meaning the same thing when construing section 1049, and concluded that "disability" means "lost of total body function." 15 N.T.C. § 1049(e). It concluded that the Act does not allow consideration of nonphysical matters, or a "disability" as defined by Joe, to calculate benefits for a nonscheduled permanent partial disability. A physical impairment rating can be determined "within reasonable certainty." The Board chose to accept the five percent impairment rating on that basis, and it awarded $1,748.63 as compensation for Joe's back injury.

## II

The issue is whether the Board correctly construed the Navajo Nation Workmen's Compensation Act to require use of a medical impairment rating, or whether the Board should have considered Joe's education, training and experience when making an award.

## III

The standard of review in this appeal, from a decision of a Navajo Nation administrative agency exercising quasi-judicial authority, is whether its decision was based upon a mistake as to the applicable law. *Navajo Skill Center v. Benally*, 5 Nav. R. 93, 96 (1986). The more specific question presented to this Court is whether principles of statutory construction support the Board's approach.

A fundamental canon of statutory construction is that a statute cannot be read by taking legal terms out of their proper context. Joe focuses upon the term "disability," advocating a vocational standard for benefits, without reference to the overall scheme of the statute. Social security statutes such as the Act must be read in light of their purpose, and the intent of the Navajo Nation Council is

ascertained by reading the statute as a whole. What was the intent of the Navajo Nation Council?

Worker's compensation laws[1] are a compromise. They give injured workers a remedy for work place injuries in place of a right to sue an employer. The remedy is liberally construed in favor of the worker, but the tradeoff is limitations upon benefits.

"[T]he Navajo Tribe of Indians is, in fact, a sovereign nation for the purposes of workmen's compensation, governed by the laws as set forth by the Navajo Tribal Council and ... no other workmen's compensation law is applicable." 15 N.T.C. § 1003(a). The Navajo Nation previously participated in worker's compensation programs as a self-insured employer. Under this approach, the employer sets aside reserves to pay for claims rather than purchase insurance or participate in a state fund through contributions.

The history of the Act clearly shows that the Council intended to perpetuate a self-insurance approach, creating a fund to pay benefits from contributions by Navajo Nation agencies, entities, and industries. But, the self-insurance approach is limited by the ability of covered employers to contribute funds. The reality is a major factor when construing compensation for injuries.

The Act addresses scheduled and non-scheduled injuries. A "scheduled" injury provides for the loss or loss of use of a member of the body. 15 N.T.C. § 1049(b). A "nonscheduled" injury is one which is not specifically listed, and "[f]or other nonscheduled, permanent impairments, a calculation of percentage of total permanent disability is made." 15 N.T.C. § 1049(c).

The parties advised the Court that the drafter of our Act relied upon a standard worker's compensation text as a drafting model. That is apparent from the body of the benefits section, which explains the approach to nonscheduled permanent impairments. It is:

> that the effect on earning capacity is a conclusively presumed one instead of a specifically proven one based on the individual's actual wage loss experience. The effect must necessarily be a presumed one, since it would be obviously unfair to appraise the impact of a permanent injury on earning capacity by looking at the employee's earning record for some relatively short temporary period preceding the compensation award. The alternative is to hold every compensation case involving any degree of permanent impairment open for a lifetime, making specific calculations of the effect of the impairment on the employee's earnings each time the employee contends that his earnings are being adversely affected.

15 N.T.C. § 1049(c). This approach addresses unscheduled or more generalized impairments, "which are rated on the percentage of disability (loss of total body function) of the entire body, from the scheduled amount for permanent total disability." 15 N.T.C. § 1049(e).

The Board had a difficult task, because the statute obviously mixes and does

---

1. We prefer the modern gender-neutral term "worker's compensation" to refer to such laws.

not adequately separate the concepts of disability and impairment of the bodily function. The Board reasonably interpreted its own statute. The result it reached does not fly in the face of the statute and, read as a whole, it addressees the reality of limited funds and the equal treatment of workers. We sustain its reading of the statute.

## IV

This construction of the statute is also in harmony with principles of Navajo common law. At oral argument, the Court raised the question of whether there are Navajo common law principles to construe the Act. There is a Navajo common law of insurance, which is a method of sharing risks. In the past, when a Navajo was injured, he or she could rely upon family and clan members to provide for the necessities of life. If a Navajo was injured by the act of another, the victim could demand *nalyeeh*, which is a form of compensation or reparation. In either situation, the amount of support owing by the family, clan, or another (including that person's family and clan) depended upon what they had. *Nalyeeh* is a form of distributive justice, where the concern is to address need in accordance with resources. Navajos shared the risks of life by giving what they had to those who suffered an injury. What was given depended upon what others actually had.

Likewise, the Navajo Nation has limited resources to compensate its injured workers. We concur with the Board's decision that it could not consider open-ended "nonphysical matters" or the claimant's theory of vocational impairment as a "disability," but must use an approach which provides reasonable certainty. Its decision also conforms with Navajo common law.

We AFFIRM the August 11, 1992 decision of the Workmen's Compensation/Employees' Benefits Review Board.

\* \* \*

AUSTIN, Associate Justice, Dissenting.

Claimant Joe was a diesel mechanic, who suffered two injuries to his back. For the first injury, Joe received $8,000.00 in compensation, not from the Navajo Nation, but from the manufacturer of the transmission in an out of court settlement. The second injury aggravated the first and made it permanent. The final effect of the second injury was some degree of permanent partial disability.

The second injury left Joe with restrictions on lifting and doing heavy work. The jobs that are compatible with Joe's education, training and experience are much lower now that he cannot do heavy work. Work as a diesel mechanic requires lifting, pushing, pulling and manipulating heavy objects, including heavy equipment engines, engine parts and wheels. Joe is unable to work at his usual trade as a diesel mechanic, because "he [can] not lift more than 30 pounds." Findings of Fact No. 12, Final Decision of Workmen's Compensation/Employees' Benefits Review Board (decided August 11, 1992).

The worker's compensation program offered Joe compensation based upon a doctor's recommendation of a five percent physical impairment rating. Joe refused the offer contending that the disability caused by the injury was greater than five percent, because he is permanently precluded from doing heavy work. The Employees' Benefits Review Board affirmed the program's offer, noting that the terminology of 15 N.T.C. § 1049 "suggests and indicates that, for Code and award purposes, 'disability' and 'impairment' are practically the same." Board's Decision at 7.

The "Schedule of Benefits" specifies certain amounts of compensation for distinct disabilities, such as loss of arm, hand, fingers, leg, and others. 15 N.T.C. § 1049(i)-(k). For "nonscheduled" injuries, including Joe's back injury, a different approach for evaluating them is set forth at section 1049(c). Section 1049(c) reads as follows:

> For other nonscheduled permanent impairments, a calculation of percentage of total permanent disability is made. The award made pursuant to the schedule of benefits is the exclusive remedy. This is not, however, to be interpreted as an erratic deviation from the underlying principle of compensation law as found in many states. The basic theory remains the same; the only difference is that the effect on earning capacity is a conclusively presumed one instead of a specifically proven one based on the individual's actual wage loss experience. The effect must necessarily be a presumed one, since it would be obviously unfair to appraise the impact of a permanent injury on earning capacity by looking at the employee's earning record for some relatively short temporary period preceding the compensation award. The alternative is to hold every compensation case involving any degree of permanent impairment open for a lifetime, making specific calculations of the effect of the impairment on the employee's earnings each time the employee contends that his earnings are being adversely affected.

Section 1049(c) is indeed confusing. It is nearly word-for-word (beginning with "This is not, however, to be") lifted from Professor Larson's treatise on worker's compensation law. See A. Larson, _Workmen's Compensation for Occupational Injuries and Death_ § 58.11 (Desk Edition, Vol. 2, 1988). What appears as a Navajo statute on nonscheduled injuries is nothing more than a rationale for using a schedule in Professor Larson's treatise.[1] Due to that paradox, the court should have read the first sentence of section 1049(c)[2] together with section 1034(a) to arrive at a method of evaluating Joe's injury.

I construe the relevant language[3] of section 1049(c) to mean that for a non-

---

1. The majority takes the view that the language I am referring to "explains the approach to nonscheduled permanent impairments." 7 Nav. R. at 68. I disagree. If it explains anything, it would have to be the language immediately preceding it, which states "The award made pursuant to the schedule of benefits is the exclusive remedy." That is consistent with Professor Larson's explanation.

2. The first sentence of section 1049(c) reads as follows: "For nonscheduled permanent impairments, a calculation of percentage of total permanent disability is made."

3. The first sentence of section 1049(c) is quoted above in footnote 2.

scheduled permanent disability, the percentage must be fixed by considering total disability. The term "total disability" is defined at 15 N.T.C. § 1034(a):

(a) Total disability means complete incapacity to engage in an occupation as a result of an occupational injury or disease. Occupation means any vocation for which the employee is or becomes reasonably fitted by education, training or experience.

The two sections read together lead to the conclusion that a nonscheduled permanent disability is evaluated by taking into account the education, training, and experience of the injured worker. This determination would go beyond the doctor's medical rating and consider the vocational impact of the permanent disability, a result I consider fair to the permanently injured worker.

Several considerations support the method that I find appropriate. First, it is fair to Joe (and similar claimants), because permanent disability usually precludes a person from working at his trade to the fullest. For example, Joe cannot work as a diesel mechanic again due to his restrictions on lifting heavy objects. In contrast, a, nonpermanent injury lacks similar consequences; the person can return to his or her usual duties and do everything he or she did prior to the injury. If Joe's injury fell into the latter, I would agree that only a doctor's rating should be sufficient to determine compensation.

Second, the purpose of worker's compensation law is to "give injured workers a remedy for work place injuries in place of a right to sue an employer." 7 Nav. R. at 68. The worker has given up important remedies; consequently, worker's compensation law "is liberally construed in favor of the worker." *Id.; See, Industrial Comm'n. of Wisconsin v. McCartin*, 330 U.S. 622, 628 (1946); *Pottinger v. Industrial Comm'n. of Arizona*, 490 P.2d 1232, 1236 (Ariz. App. 1974). Where a worker has suffered a permanent disability, the provisions of our worker's compensation law should be construed to permit full recovery and, in this case, that would include considering the vocational impact of the injury.

Third, clear distinctions should be drawn in our law between scheduled injuries and nonscheduled injuries and between nonpermanent injuries and permanent injuries. An employee would then be aware of the remedies and exercise a meaningful choice between waiving legal action or not. See 15 N.T.C. § 1014 (1978).

Finally, the conclusion I reach is in accord with a growing number of jurisdictions. The modern trend is back to compensation based upon vocational impact of the injury. A. Larson, *Workmen's Compensation for Occupational Injuries and Death* § 5718. It is also consistent with Navajo common law, as stated by the majority. 7 Nav. R. at 69.

For the reasons stated, I respectfully dissent.